IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

REBECCA ELAINE THORNTON,

        Plaintiff,                         OPINION AND ORDER

        v.                                 11-cv-199-wmc

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

        Defendant.

---

This is an action for judicial review of an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Rebecca Elaine Thornton, proceeding pro se, seeks reversal of the Commissioner's decision finding her ineligible for Disability Insurance Benefits and Supplemental Security Income. Thornton contends that the administrative law judge erred when he (1) rejected the opinion of her treating physician, (2) failed to account for other evidence in the record concerning the extent of her impairments, (3) discounted her mental health issues, and (4) used bullying tactics during the hearing. Because the court rejects all of plaintiff's challenges, the court will affirm the Commissioner's decision.

FACTS[1]

**A. Procedural History**

Rebecca Elaine Thornton was born on October 29, 1961. (AR 512.) She had a high school education and past relevant work as a financial specialist and a printing assistant. (AR 26-27.)

On December 3, 2004, Thornton filed an application for disability insurance benefits and supplemental security income through her counsel, alleging that degenerative disc disease rendered her disabled as of June 7, 2004. (AR 102, 172.) After the local disability agency denied Thornton's application initially and upon reconsideration, she requested a hearing, which was held on January 16, 2007, before Administrative Law Judge Arthur J. Schneider. (AR 467-500.) On March 20, 2007, the ALJ issued his decision, finding Thornton disabled as of April 27, 2005. (AR 45-52.)

Now proceeding *pro se,* Thornton appealed the favorable decision seeking reconsideration of the date of onset and the monthly benefit amount. (AR 78-81.) The appeals council vacated the ALJ's March 20, 2007, decision and remanded for additional evaluation of Thornton's claimed impairments. (AR 55-57.) A second hearing was held before the same ALJ,[2] at which Thornton (AR 512-37, 547-48), a neutral medical expert (AR 537-43), and a neutral vocational expert (AR 544-47, 549) all testified.

---

[1] The following facts are drawn from the administrative record ("AR").

[2] Although the transcript of the hearing identifies the judge as "Judge Steiner (phonetic)," it appears the hearing was actually held before Judge Schneider, who referred to testimony at the second hearing in his second decision.

On August 14, 2009, the ALJ issued a second decision, this time finding plaintiff *not* disabled from June 7, 2004, through the date of his decision. (AR 17-28.) Following Thornton's unsuccessful appeal, this decision became the final decision of the Commissioner on January 12, 2011. (AR 5-7.)

B. **Medical Evidence**

Thornton began experiencing back and neck pain after a 1997 work accident. (AR 249.) A 2000 magnetic resonance imaging scan (MRI) showed degenerative disc disease. (AR 222.) She had back surgery in 2000. (AR 249.)

In May 2004, Thornton saw Dr. Frank Salvi, her treating orthopedist, and reported she continued to experience pain in her neck, shoulders and arms. (AR 291.) On examination, her cervical spine was tender to the touch and her range of motion was somewhat limited, especially on the right side. Salvi encouraged her to continue strengthening and stretching exercises and taking over-the counter analgesics. (AR 291.) He also limited her to light duty work. (AR 292.)

In June 2004, Dr. Salvi referred Thornton to Dr. Stephen Krause, a pain psychologist. (AR 288-89.) Thornton reported to Krause that she had depressive symptoms such as poor concentration, sleep disturbance, irritability, loss of appetite and feelings of hopelessness. While she reported organizing daily household activities -- such as laundry, cooking and cleaning -- her children performed many of the physical tasks. (AR 288.) Krause observed Thornton complaining about pain and rubbing the affected area throughout the appointment. He ultimately concluded that Thornton was

3

struggling with chronic pain syndrome with loss of activity, had poor pain coping skills and displayed depressive symptoms. This prompted his diagnosis of depression. (AR 289.) Thornton saw Dr. Krause again on July 15 for therapy. (AR 287.)

In August 2004, Thornton saw Dr. Salvi again complaining of persistent neck pain, which increased with aggressive physical activity and extreme twisting. Therapeutic exercise and over-the counter medication helped ease the pain. (AR 285.) Thornton saw Dr. Salvi again on February 9, 2005. On examination her lower back was tender to the touch; she had difficulty putting full weight on her left leg; and bending produced pain. Salvi recommended physical therapy. (AR 283.)

On March 2, 2005, Dr. Salvi completed a residual functional evaluation for Thornton. By this time, he had seen Thornton nine times to treat degenerative disc disease in her back and neck. (AR 237.) Dr. Salvi found that Thornton could sit for 20 minutes at a time and stand for 45 minutes at a time for a combined total of less than two hours in an 8-hour work day. (AR 238-40.) Dr. Salvi also indicated Thornton would need to walk frequently and be able to change positions at will, could rarely bend and twist at the waist and would need to lie down for at least an hour each work day. (AR 240-41.) Finally, he found she could lift 20 pounds rarely, 10 pounds occasionally and less than ten pounds frequently. (AR 240.)

An MRI on March 28, 2005, revealed scar tissue and a bulging disc in Thornton's lower back that caused mild narrowing of the central canal and mild stenosis. (AR 244, 282.) In April 2005, Thornton had an epidural steroid injection to treat her low back pain. (AR 278-79.) In May 2005 Salvi indicated that the injection had dramatically

4

improved Thornton's pain, but that she was experiencing more pain after an automobile accident. Thornton reported increased pain with aggressive physical activities, driving and household chores. (AR 339, 418.) Dr. Salvi recommended physical therapy and exercise, along with avoiding heavier lifting and frequent twisting. He also prescribed extended-release morphine for her more severe pain. (AR 340.)

In June 2005, Dr. Salvi performed an electro-diagnostic evaluation of Thornton, which revealed no evidence of peripheral neuropathy or acute left-sided radiculopathy, but indicted chronic left-sided radiculopathy. (AR 373.) Salvi recommended physical therapy. (AR 373, 410-13, 416.) At the therapy sessions, Thornton reported that she was able to move better, but the therapist noted that any assessment was difficult due to Thornton's pain behaviors. (AR 412-13.)

On August 29, 2005, Dr. Jerome Ebert saw Thornton in Dr. Salvi's absence. He stated as follows:

> Her examination today again is rather strange. She has lots of pain behaviors, a lot of grimacing and moaning, and when doing so she demonstrates near normal cervical range of motion. However, if I ask her to bend her neck in flexion or extension or turn to the sides, she demonstrates almost no cervical range of motion.

(AR 345.) Thornton had normal reflexes and strength. Dr. Ebert also noted that she had not refilled her morphine prescription since May, so it appeared she was not using it. (AR 345.) He concluded that it was very difficult to get a clinical sense of what was going on with Thornton but thought there were major psychological issues. Dr. Ebert

5

stated he would not be giving her any more morphine just to have around to take once in a while as needed. (AR 346.)

Dr. Ebert referred Thornton for an epidural steroid injection on September 21, 2005. (AR 369.) On October 24, 2005, Dr. Ebert noted that the injection provided relief for the radicular symptoms in her legs, but she continued to experience low back pain. (AR 348.) Examination revealed full and symmetric strength and reflexes and a normal gait. Ebert noted that Thornton did not want to be examined further, but did not give a reason. He then referred her to physical therapy. (AR 348.)

An MRI on February 8, 2006, confirmed Thornton had multilevel degenerative disc disease, but was largely unchanged from previous scans. (AR 367, 424, 454.) Thornton went to physical therapy sessions from February to May 2006. (AR 388-401.) She reported her pain was more tolerable. (AR 396, 398.) She also reported playing with her dog daily. (AR 392.) Thornton was encouraged to walk, engage in cardiovascular activity, exercise with a stability ball and engage in stretching exercises. (AR 389.) In June 2006, however, Thornton told Dr. Felipe Manolo that she could barely move her neck. He referred her to a spine clinic. (AR 387.)

On July 31, 2006, Thornton again saw Dr. Ebert and demanded that he change her records, particularly his notes from her August 29, 2005, appointment speculating about a psychological underpinning to her back pain. Ebert told her that the record could not be changed, but that he would note her concerns. (AR 361.) On examination, Dr. Ebert noted she had full range of motion with flexion and extension of her neck and upper extremities, but that her rotation is limited by pain. Ebert commented that when

6

she demonstrated exercises, she was not doing them properly and that her sitting posture was quite poor. (AR 362.)

On August 28, 2006, Thornton returned to see Dr. Ebert. (AR 364.) At that time, she reported neck symptoms with numbness and tingling down the right upper extremities. Before Ebert could proceed with the examination, Thornton again questioned his previous notes. Thornton began the exam on her hands and arms, but then refused to do any further movements. She asked for morphine saying that Dr. Manolo would not give her any more. Ebert refused to prescribe morphine for her but suggested a medication for nerve pain. Ebert also referred her to patient relations because of her concerns about her medical records. (AR 364.)

On September 22, 2006, Thornton saw Dr. Manolo, who noted that she had chronic cervical and low back pains because of multilevel degenerative disc disease. Manolo observed that Thornton moved briskly and without apparent difficulty. He urged her to try acupuncture, massage and yoga. Manolo also noted that Thornton was narcotic dependent, but nevertheless renewed her morphine prescription. (AR 381.) In November 2006, Thornton returned to physical therapy. (AR 277.) Thornton told the therapist that she still experienced pain, but was able to work out daily with a stability ball, and that she was planning to join a gym. (AR 377.) As had Dr. Ebert, the therapist noted Thornton was not performing her exercises correctly. (AR 378.)

MRI results dated July 22, 2008, showed a slight to moderate disc protrusion at L2-S1 and mild to moderate abnormalities at C4-7. (AR 437-40.)

### C. Consulting Physicians

On February 1, 2005, state agency physician M.J. Baumblatt completed a physical residual functional capacity assessment for Thornton, listing a diagnosis of degenerative disc disease of the cervical spine. (AR 225.) Baumblatt found that Thornton could lift 20 pounds occasionally and 10 pounds frequently, stand or walk six hours in an eight-hour workday and sit six hours in an eight-hour workday. (AR 226.)

On February 4, 2005, Dr. Ward Jankus examined Thornton for the state disability agency. She reported having neck and back pain dating back to 1997. (AR 233.) On examination, Dr. Jankus noted that Thornton had moderate pain behaviors with groans, grimaces and wincing. He indicated that she had limited range of motion, which was affected by her fear of more pain. (AR 234.) The neurological examination was normal. Dr. Jankus concluded that it would be difficult to attribute all her pain issues to one level cervical disc herniation and that it was difficult to say how much of the pain issue was an organic problem. (AR 235.)

### D. Hearing Testimony

At the second hearing, Thornton testified she had experienced back and neck pain since a work accident in the late 1990's. (AR 515.) Thornton further testified that she could not work because of pain. Although she testified to having had been fired from her job in 2004 while on medical leave, the ALJ pointed out the dismissal letter from her employer states that it was because of attendance issues related to taking her children to

school.  (AR 515, 524-25.)   Thornton applied for and received unemployment benefits.  (AR 515-16, 523-24.)

Thornton testified that she continued to receive epidural injections to treat her back pain.  (AR 534-35.)  She also saw a mental health practitioner in 2004.  Thornton testified that her depression interfered with her ability to concentrate and pain made it hard for her to keep her full attention on things.  (AR 518, 530.)  She further claimed her pain had gotten worse, particularly in her fingers.  (AR 521.)

Thornton acknowledged getting her children off to school and supervising their homework, but because she experienced pain all day, her children did the physical tasks for her.  (AR 520-21.)  Thornton also testified that she could not lift more than three to five pounds and could walk no more than five to ten steps.  (AR 521.)  Because her pain made it hard to sleep, she was never rested.  (AR 522.)

The ALJ called Dr. James A. Armentrout, a licensed psychologist, to testify as a neutral medical expert about Thornton's mental impairments.  He found that Thornton had no documented mental or emotional impairments.  (AR 542.)

Next, the ALJ called Richard C. Willette as a neutral vocational expert.  (AR 534.) He testified that a hypothetical individual with Thornton's characteristics and residual functional capacity could perform her past relevant work as a financial assistant and printing assistant.  (AR 545-46.)  The expert also testified that this individual could perform 9,000 light greeter jobs, 19,280 light housekeeper jobs and 10,280 light laundry worker jobs.  (AR 547.)

### E. Administrative Law Judge's Decision

In reaching the conclusion that Thornton was not disabled, the ALJ performed the required five-step sequential analysis. See 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Thornton had not engaged in substantial gainful activity since June 7, 2004, her alleged onset date. At step two, he found that Thornton had the severe impairment of disorders of the back. (AR 20.) He also specifically found that Thornton did *not* have a severe mental impairment. (AR 21.)

At step three, the ALJ found that Thornton did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1. Specifically, he concluded that Thornton's back impairment did not meet or equal one of the musculoskeletal listings. (AR 21.)

The ALJ also found that Thornton retained the residual functional capacity to perform light work involving lifting 20 pounds occasionally and 10 pounds frequently, sitting for six hours in an eight hour work day and standing and walking for six hours in an eight hour work day, meaning she is capable of only simple routine and repetitive work. (AR 21.)

In determining this residual functional capacity, the ALJ assessed Thornton's credibility according to the requirements of 20 C.F.R. 404.1529 and 416.929 and Social Security Rulings 96-4p and 96-7p. He considered Thornton's testimony that she could not work because of extreme pain, problems concentrating, drowsiness, numbness and difficulty twisting, bending or turning. After considering the medical evidence and Thornton's activities, the ALJ concluded that her testimony was not credible. (AR 22.)

In assessing Thornton's physical residual functional capacity, the ALJ summarized the medical evidence in the record, including the 2005, 2006 and 2008 MRI reports. He gave significant weight to the opinions of Drs. Krause, Jankus, and Ebert because they were internally consistent and consistent among providers. The ALJ rejected the opinion of Dr. Salvi because it was inconsistent with his office visit notes, including his statements that Thornton had made dramatic progress and was able to return to work with restrictions. Also, the ALJ noted that in a report dated July 7, 2004, Dr. Salvi had indicated that Thornton was able and available for light work. (AR 26.)

At step four, the ALJ found, based on the testimony of the vocational expert, that Thornton was able to perform her past relevant worker as a financial specialist and a printing assistant. (AR 26.) Alternatively, at step five, the ALJ found, based on the testimony of the vocational expert, that there were jobs in significant numbers in the national economy that Thornton could perform, including greeter, housekeeper and laundry worker. The ALJ also opined that the testimony of the vocational expert was consistent with the information contained in the Dictionary of Occupational Titles. (AR 27-28.)

OPINION

The standard by which a federal court reviews a final decision by the Commissioner is well settled: the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision, *Clifford*, 227 F.3d at 869, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When the ALJ denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

In her brief, Thornton directs the court to evidence in the record, which she appears to contend undermines the ALJ's rejection of the opinions of one of her treating physicians, Dr. Salvi. (Pl.'s Br. (dkt. #13) 3-4.) While this would seem Thornton's strongest argument for challenging the ALJ's conclusion at Step Four that she could perform her past work and alternative conclusion at Step Five that Thornton was capable of performing work in the national economy, the court ultimately rejects it for reasons set forth below. Most of the remainder of Thornton's brief involves her highlighting additional evidence in the record as support for a finding of impairment or the extent of that impairment (*id*. at 3-9), but this goes nowhere since the ALJ already found her to

have a severe impairment due to disorders of the back. In addition, Thornton half-heartedly challenges the ALJ's failure to address her depression in a simple six-word sentence, amounting to no more than a throw-away line. Having not developed the argument, neither will the court. (*Id.* at 11.) Finally, Thornton contends that the ALJ "used bullying, undermining and condescending tactics." (*Id.* at 1.) The court rejects this challenge as well, but briefly addresses it at the end of this opinion.

I. Treating Physician's Opinions

Thornton claims that the ALJ erroneously rejected the opinion of her treating physician, Dr. Salvi, that she could not work. The Commissioner has established a regulatory framework that explains how an ALJ is to evaluate medical opinions, including opinions from state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(d), 416.927(d). Generally, opinions from sources who have treated the plaintiff are entitled to more weight than non-treating sources, and opinions from sources who have examined the plaintiff are entitled to more weight than opinions from non-examining sources. 20 C.F.R. §§ 404.1527(d)(1) and (2), 416.927(d)(1) and (2). Other factors the ALJ should consider are the source's medical specialty and expertise, supporting evidence in the record, consistency with the record as a whole and other explanations regarding the opinion. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6). Finally, the ALJ "must explain in the decision" the weight given to the various medical opinions in the record. 20 C.F.R. §§ 404.1527(f)(2)(ii); 416.927(f)(2)(ii).

"[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported and no evidence exists to contradict it, the ALJ has no basis on which to refuse to accept the opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the ALJ to weigh," taking into consideration the various factors listed in the regulation. *Hofslien*, 439 F.3d at 377. These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition, how consistent the physician's opinion is with the evidence as a whole and other factors. 20 C.F.R. § 404.1527(d)(2); *see also Scott v. Astrue*, 647 F.3d. 734, 740 (7th Cir. 2011) (reaffirming this standard).

An ALJ must provide "good reasons" for the weight he gives a treating source opinion, *Scott*, 647 F.3d at 740, and must base his decision on substantial evidence and not mere speculation, *White v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999). Moreover, an opinion of a *non-examining* physician is not sufficient by itself to provide evidence necessary to reject a treating physician's opinion. *Gudgel v. Barnhart*, 345 F. 3d 467, 470 (7th Cir. 2003).

In this case, however, the ALJ gave ample justification for rejecting Dr. Salvi's opinion. First, it was inconsistent with Salvi's own office notes, including his statements that Thornton had made dramatic progress and was able to return to work with restrictions. Second, he refers to Salvi's May 2004 opinion that Thornton was limited to

14

light duty work. Third, the ALJ considered the records of Drs. Krause and Ebert, who also treated Thornton at various times, as well as the opinions of consulting physician, Dr. Jankus, all of which the ALJ found were internally consistent and consistent with each other. Finally, the ALJ pointed to other objective evidence, including Thornton's 2005, 2006 and 2008 MRI's, which called into question Dr. Salvi's more extreme diagnosis. Given this record, the court has little trouble finding that the ALJ properly weighed the medical opinions and did not err in rejecting Salvi's opinion.

## II. Rejection of Evidence of Extent of Impairment

Thornton's criticism of the ALJ's treatment of evidence about the extent of her impairment is unpersuasive. First, Thornton takes issue with the ALJ stating that she "admitted . . . seeking drugs," pointing to an August 29, 2005, note in her medical record in which Dr. Ebert stated that Thornton was *not* asking for a refill of her medication. (Pl.'s Br. (dkt. #13) 2-3.) The ALJ did not err, however, in his summary of the medical record -- there are other recorded notes by Dr. Ebert stating that Thornton became hostile in demanding drugs. (AR 364, 381.) While Thornton appears to take issue with Ebert's characterization of that event, the ALJ accurately reported that a treating physician had expressed concern about Thornton's drug-seeking activities. Even if this were not so, the ALJ does not appear to rely on this report at all, and certainly not heavily, in finding that Thornton was capable of working.

Second, Thornton challenges the ALJ's characterization of her reported daily activities, particularly her reliance on the assistance of her children in performing daily

15

tasks. (Pl.'s Br. (dkt. #13) 3.) While the ALJ did not specifically note her children's assistance in completing household responsibilities, the ALJ correctly stated other admitted activities, including walking, driving, swimming, and playing with her dogs. Moreover, a failure to note a single fact does not undermine the ALJ's larger holding.

Third, Thornton points to additional evidence in the record of her pain, which she believes the ALJ failed to consider. Specifically, Thornton points to doctor's notes of her exhibiting pain "behavior," her use of Tylenol, and objective evidence of degenerative disk disease. (Pl.'s Br. (dkt. #13) 3-9.) The ALJ, however, acknowledged all of this evidence in his decision. (AR 23 (referring to Dr. Jankus's treatment note that Thornton exhibited pain behaviors); 22 (stating Thornton acknowledged taking ibuprofen and Tylenol); 23 (referring to Dr. Jankus's note that Thornton was managing her pain with Tylenol); 24 (noting Dr. Ebert's note that Thornton was using Tylenol and ibuprofen to control her pain); 22 (noting MRI results which showed only mild to moderate abnormalities); 23 (noting that March 29, 2005, MRI showed "mild to moderate abnormalities of L3-S1").) The ALJ not only acknowledged this evidence of pain in his decision, it also likely formed the basis for his finding that Thornton suffered from a severe impairment.

## III. Consideration of Mental Impairment

On the final page of her brief, Thornton states simply that "Plaintiff's depression is situational and continues." (Pl.'s Br. (dkt. #13) 11.) In his decision, the ALJ considered whether Thornton suffered from a mental impairment, but found that the

only evidence in the record -- a June 15, 2004, note from pain psychologist, Dr. Krause -- was insufficient to support such a finding. (AR 20.) The ALJ also noted Thornton's own concession at the hearing that "there is nothing in the record showing that she had psychological problems and she has <u>never</u> been told she has a severe mental disorder." (AR 26.) Based on this, the court finds no error in the ALJ's conclusion that Thornton did not suffer from a severe mental impairment.

## IV. ALJ Bias

As a final matter, Thornton contends that ALJ Schneider was "bullying, undermining and condescending." (Pl.'s Br. (dkt. #13) 1.) Thornton does not, however, point to any specific instance in the record itself. Nor after examining the transcripts of both hearings before Judge Schneider, could the court find evidence of such behavior. Even if some evidence existed to support Thornton's characterization, the ALJ is entitled to a presumption of impartiality and Thornton has not demonstrated the kind of "deep-seated and unequivocal antagonism" necessary to set aside his findings. *Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

## ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, is AFFIRMED, and plaintiff Rebecca Elaine Thornton's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 13th day of March, 2014.

                          BY THE COURT:

                          /s/

                          _____
                          WILLIAM M. CONLEY
                          District Judge